[Cite as *Buckeye Retirement Co., L.L.C., Ltd. v. Busch*, 2017-Ohio-4009.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY**

| | | |
|---|---|---|
| BUCKEYE RETIREMENT CO., LLC, LTD. | : | |
| | : | |
| | : | Appellate Case No. 2016-CA-32 |
| *Plaintiff-Appellant/Cross-Appellee* | : | |
| | : | Trial Court Case Nos. 2007-CV-590 |
| | : | and 2011-CV-428 |
| v. | : | |
| | : | (Civil Appeal from |
| JOHN R. BUSCH, et al. | : | Common Pleas Court) |
| | : | |
| *Defendants-Appellees/Cross-Appellants* | | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 26th day of May, 2017.

. . . . . . . . . .

JAMES C. CARPENTER, Atty. Reg. No. 0012228, VINCENT I. HOLZHALL, Atty. Reg. No. 0074901, 41 South High Street, Suite 2200, Columbus, Ohio 43215
 Attorneys for Plaintiff-Appellant/Cross-Appellee

GEORGE D. JONSON, Atty. Reg. No. 0027124, G. TODD HOFFPAUIR, Atty. Reg. No. 0064449, 36 East Seventh Street, Suite 2100, Cincinnati, Ohio 45202
JOHN D. SMITH, Atty. Reg. No. 0018138, ANDREW P. MEIER, Atty. Reg. No. 0083343, IRA H. THOMSEN, Atty. Reg. No. 0023965, 140 North Main Street, Suite B, P.O. Box 639, Springboro, Ohio 45066
 Attorneys for Defendants-Appellees/Cross-Appellants

. . . . . . . . . . . .

WELBAUM, J.

**{¶ 1}** In this case, Plaintiff-Appellant, Buckeye Retirement Co., LLC, Ltd. ("Buckeye") appeals from a judgment rendered in favor of Defendants-Appellees/Cross-Appellants, John Busch, Thomas Noland, and Statman, Harris & Eyrich, LLC ("Statman"), following a bench trial. Busch, Noland, and Statman have all filed cross-appeals asserting assignments of error.

**{¶ 2}** Buckeye contends that the trial court erred in finding that Busch was not liable for fraudulent concealment and/or fraudulent representation, and in finding that Noland was not liable for tortious interference with contractual relations. Finally, Buckeye contends that the trial court erred by failing to find Statman vicariously liable for the conduct of Noland, who was a member in Statman.

**{¶ 3}** Noland's assignments of error raise the trial court's alleged error in concluding that Buckeye purchased the tort rights asserted in this matter, and the court's alleged error in concluding that Noland could be sued, as USAT's agent, for interference with a contract. Likewise, Busch contends that Buckeye did not have the ability to pursue its claims against any of the Appellees/Cross-Appellants.

**{¶ 4}** We conclude that the trial court did not err in awarding judgment in favor of Noland, Statman, and Busch. Accordingly, the judgment of the trial court will be affirmed. Furthermore, affirmance of the judgment in favor of Appellees/Cross-Appellants, Noland, Statman, and Busch renders their assignments of error moot.

## I. Facts and Course of Proceedings

**{¶ 5}** This action arose from events occurring prior to a bankruptcy proceeding filed

by U.S. Aeroteam, Inc. ("USAT") on December 24, 2003. When the bankruptcy was filed, Suhas Kakde was the chief executive officer, president, and majority stockholder in USAT, John Busch was the chief financial officer and vice-president of finance for USAT, and Thomas Noland was legal counsel for USAT. Noland was a member in Statman, and had practiced bankruptcy law, including Chapter 11 bankruptcies, for many years.

{¶ 6} In 1998, USAT was a preferred supplier, on a minority disadvantaged basis, with General Motors Corporation ("GM"). USAT had primarily been involved in the aerospace industry, but at GM's behest, began submitting bids for automotive work with GM and Delphi, which became a separate entity from GM in 1999. Based on discussions with GM, USAT geared up to meet the GM/Delphi business, which required an infusion of additional capital. At the time, USAT had an existing loan with First International Bank, which subsequently became United Parcel Service Credit ("UPS"). UPS had a considerable inventory credit line available for USAT, but could not expand the line to match USAT's business plan. As a result, USAT looked for other lenders and entered into an asset based loan with Provident Bank ("Provident") in November 2000.

{¶ 7} Asset based loans, also known as revolvers, are ones in which creditors allow advances against collateral, inventory, and equipment. Remittances back to the creditor (from accounts receivable of debtors) are typically made to a lock-box. The amounts advanced vary up to the maximum amount of the note, and fluctuate based on expansion or contraction of a debtor's receivables and inventory. Advance rates reflect the quality of a debtor's receivables, and typically vary between 70 and 85% of the total amount of the receivables. Generally, the advance rate applied to inventory is 50% of the value of raw inventory or finished goods. These loan formulas, which discount the

real value of assets, mean that creditors may be made whole upon liquidation without recovering 100% of a debtor's assets.

**{¶ 8}** The maximum amount of the Provident loan was the lesser of $2,500,000 or the sum of: (1) 50% of the cost or market value, whichever was lower, of eligible inventory; (2) 80% of the amount of eligible receivables; and (3) 100% of the balance of the cash collateral account (collectively referred to as the "borrowing base"). In other words, the maximum amount USAT could borrow was $2,500,000, and the amount available on a given date varied, depending on the extent of USAT's eligible inventory and receivables, as well as how much money had already been borrowed. Ultimately, the amount of eligible receivables increased to 85%, due to the quality of USAT's receivables.

**{¶ 9}** The amount available under the loan was calculated through borrowing base reports or certificates (BBCs), which USAT submitted to Provident. BBCs contained reports of accounts receivable, inventory, and some other items that Provident used to calculate the formula and the amount available to USAT on the loan.

**{¶ 10}** The loan agreement did not provide specific times for submission, nor did it contain detailed requirements for content of the BBCs; instead, the agreement simply stated that the bank could require USAT to deliver schedules of all outstanding accounts. These schedules were to "be in form satisfactory to the Bank and shall show the age of such Accounts in intervals of not more than 30 days, and contain such other information and be accompanied by such supporting documentation as the Bank may from time to time prescribe." Joint Ex. 2, section 5.3, pp. 10-11. In addition, the agreement required USAT to deliver copies of its "invoices, evidences of shipment or delivery and such other schedules and information as the bank may reasonably request." *Id.* at p. 11. The only

time specification listed for any of these records was that they be provided "from time to time solely for [the Bank's] convenience in maintaining records of the Collateral." *Id.*

{¶ 11} However, the agreement did require all collections on cash collateral to be deposited in a cash collateral account maintained by Provident, and also stated that Provident would apply all or part of the collected cash collateral on a daily basis against the loan obligation. Joint Ex. 2, section 7.1, p. 16. Any part of the collected balance in the cash collateral account that Provident elected not to apply to USAT's obligations could then be paid over to USAT's commercial account, which USAT could write checks against. *Id.* Although a lock box was used, at times creditors paid receivables directly to USAT, and USAT would deposit these payments in the cash collateral account.

{¶ 12} Certain items were ineligible to be included in calculating how much money USAT could obtain. For example, any receivables overdue more than 90 days were excluded, and if more than 25% of a customer's receivables were overdue by more than 90 days, all receivables from that customer were excluded. Money that USAT owed a customer was also excluded, as were invoices representing tooling or invoices listing receivables from non-U.S. based companies.

{¶ 13} The loan agreement also contained several financial and other covenants, and allowed Provident to take various actions, including acceleration, upon default, or at any time in its sole discretion, if the loan were due on demand.

{¶ 14} When the Provident loan was signed in November 2000, UPS had already filed multiple UCC filings covering USAT's business assets, but UPS agreed to subordinate its interest in receivables and inventory only, pursuant to an inter-creditor agreement. UPS, therefore, had a first lien on everything other than the inventory and

receivables.   Kakde personally guaranteed the loans to both UPS and Provident.

{¶ 15} USAT was in violation of major loan covenants on the first day the Provident agreement was signed.   For example, the loan agreement required a ratio of liabilities to tangible net worth of 7.5 to 1.   However, the ratio, based on an audit one month later, was 17.8 to 1.   Provident ignored this violation, and in June 2001 drastically increased the ratio to 25 to 1.   However, a financial assessment six months later showed that USAT had failed that ratio, too.

{¶ 16} The original loan document also required USAT to have a tangible net worth of $750,000.   However, an audit one month after the loan began showed that USAT had only a tangible net worth of $369,000.   Provident waived that requirement as well, and reduced the net worth requirement to $215,000.   USAT barely reached that amount the first year and missed it by December 2002.   Other violations related to the amount of current debt requirements, timely delivery of audited financials, the fact that USAT owed back taxes (more than $300,000 in early 2003); the fact that USAT was out of formula, i.e., obtained loan amounts greater than the collateral base; the fact that the bank allowed credit for receivables from one customer that were greater than 15% of the total receivables; and the fact that USAT overstated collateral by about $500,000 in 2002.

{¶ 17} In January 2002, Provident notified Kakde that the loan was in default and reminded him that he was personally liable.   The loan was on the "watch list" in May 2002, and was still in default in August 2002.   In the fall of 2002, the loan was transferred to Provident's Special Assets Division ("SAD"), and was assigned to Robert Burk, who was the vice president of the division.   The loan came to Burk because of continued losses and tight cash position.   When the loan was transferred, payments were current

on the loan, but USAT was in violation of all financial covenants.

{¶ 18} In October 2002, Delphi cancelled a part of the Saginaw Steering contract; the overall Saginaw contract had been expected to generate many millions of dollars in business for USAT. USAT's president, Kakde, communicated this information to Burk. In October 2002, the outstanding loan balance was $2,085,000, and a field audit done in December 2002 indicated that as of November 30, 2002, USAT had $1,865,000 in collateral to cover a credit line of $1,994,000. This resulted in a negative collateral position. Thus, at that time, USAT was out of formula on the loan. In addition, USAT had overstated its collateral by $350,000 in its collateral report, meaning that the loan was actually under-collateralized by almost $500,000.

{¶ 19} The audit also indicated that USAT was substantially in arrears with many vendors and was $285,000 behind in property tax. Despite these defaults, Provident continued to work with USAT and continued to lend money. This state of affairs continued throughout 2002 and 2003, until USAT filed bankruptcy in December 2003.

{¶ 20} In June 2003, Delphi cancelled the balance of the Saginaw Steering contract, which was a significant loss. At the time, Delphi accounted for 60% of USAT's business, and the Saginaw contract was one of two large contracts with Delphi. As a result, USAT contacted Thomas Noland in July 2003 to discuss filing bankruptcy. Noland met with USAT a few times in July, and concluded that USAT was in dire financial condition. By mid-July, USAT had provided Noland with various information relative to filing bankruptcy, and an extended meeting was held on July 31, 2003. Noland, Kakde, Busch, and Jeff Maag, USAT's vice-president of operations, were present at this meeting. During the meeting, they discussed USAT's financial situation, Chapter 11, creditors,

leases, what USAT had to do to comply with requirements for filing forms with the court, U.S. Trustee requirements – in all, a myriad of issues.

{¶ 21} As part of the discussion, Noland suggested that USAT open a non-lender account to fund expenses for initial post-petition operation and for his firm's retainer. Noland explained that the bankruptcy code prevents parties from using cash or collateral upon filing, without the consent of lenders or a subsequent court order. If no cash is immediately available, contracts could not be completed and employees could leave, causing reorganization to be over before it began. Noland further advised USAT to "park" money in the non-lender account for filing, and not to notify Provident about the account. However, if Provident asked, USAT was to tell Provident about the account.

{¶ 22} When Busch expressed concern about whether this was illegal or would breach the contract with Provident, Noland indicated that telling Provident would serve no purpose because Provident would take action to get the money back and USAT would have no cash for filing. According to Kakde, Noland told USAT that the company would be breaching a covenant, but also said that USAT had already breached many loan covenants.

{¶ 23} Prior to the meeting, Kakde had asked Noland to be ready to file bankruptcy as early as July 28, 2003. However, Kakde wanted to avoid Chapter 11 if possible, and hoped to obtain over two million dollars in damages from Delphi, based on the cancelled contract. On August 4, 2003, USAT opened an account with Bank One, using $50 supplied by Kakde. Kakde, Busch, and Maag were signatories on the account. Subsequently, on August 11, 2003, a $92,600 check from British Air was deposited in the Bank One account. Between August 4, 2003, and December 23, 2003, $544,299.10

was deposited into that account.

{¶ 24} In the meantime, Busch inaccurately reported items on the BCCs sent to Provident. For example, a September 3, 2003 BCC showed the British Air receivable as being in the 60-90 day range, when it had already been received on August 11, 2003. However, the money from the British Air receivable was subsequently deposited into Provident's account on September 26, 2003, because it would otherwise be listed as overdue by more than 90 days and would be removed from the cash collateral basis at that point. Busch did this with other receivables as well, meaning that Provident obtained the money; it was just not accurately reflected on a current BBC. USAT used some money in the Bank One account to pay accounts payable and also remitted money back to Provident. During the relevant time period, about $270,000 of the $544,299.10 was transferred back to Provident.

{¶ 25} In late November 2003, another customer, Borg Warner, cancelled its contract, and USAT began litigating the issue with Borg Warner. Furthermore, on December 5, 2003, Kakde received a letter from Delphi, indicating that it would offer only $150,000 for its cancelled account, instead of the 2.1 million dollar offer that Kakde had expected. At that point, USAT began to prepare to file for bankruptcy. Ultimately, Delphi indicated on December 15, 2003, that its final offer would be the $150,000 amount.

{¶ 26} In the meantime, Borg Warner wired $200,000 to USAT on December 8, 2003. This money was deposited into the Bank One account, which at that point, contained only $33.00. The $200,000 was not a receivable, but was payment for the contract cancellation. It was part of the total $544,299.10 amount put in the Bank One account. On December 11, 2003, $50,000 was disbursed from the Bank One account

to Noland's law firm. $35,000 was a retainer for the bankruptcy, and $15,000 was payment for Noland's representation of USAT in the Borg Warner case.

**{¶ 27}** The last promissory note between USAT and Provident had expired on November 1, 2003. However, Provident was not concerned about getting the note renewed, and had decided to renew it for 90 days, upon the same terms and conditions as before.

**{¶ 28}** On December 19, 2003, Burk went to USAT to discuss renewal of the line of credit. Kakde, Busch, and Noland were present at the meeting. At that time, Burk was informed that negotiations with Delphi were ongoing, and that USAT would probably file bankruptcy. After the meeting, Burk engaged outside counsel, Mike Debbeler. The record does not clearly indicate exactly when Provident learned about the Bank One account, but Provident was aware of receivable errors and the non-lender account at least by December 21 or 22, 2003.

**{¶ 29}** Rather than calling the loan, Provident asked for an audit, to which USAT agreed. USAT then filed for bankruptcy on December 24, 2003. The day before the bankruptcy filing, Provident did offset $455,000 in certificates of deposit owned by a friend of Kakde's, who had pledged the certificates to guarantee the loan. On December 30, 2003, Provident also obtained a judgment in the principal sum of $2,030,632.87, plus interest, against Kakde based on his personal guaranty of the loan.

**{¶ 30}** Provident did not object to USAT's request for an emergency order allowing USAT to use cash collateral during the Chapter 11 proceeding; USAT's motion to do so was granted on December 29, 2003, after notice and a hearing. Subsequently, Provident agreed to a February 5, 2004 cash collateral order. This occurred after

Provident had completed its audit. Provident also agreed to additional orders allowing USAT to use cash collateral during the bankruptcy. Provident's continuing agreement continued up to the time that Provident sold the USAT loan to Buckeye in December 2004.

{¶ 31} After Buckeye purchased the loan, it became involved in an adversary proceeding against Kakde, who had filed a personal bankruptcy action. In that case, the bankruptcy court concluded that Buckeye failed to prove that "Provident actually relied on the Borrowing Base Certificates in making its decision to forbear or any other decisions pertaining to the Loan as a whole, a prerequisite to finding the entire Loan balance debt nondischargeable as to Mr. Kakde." *In re Kakde*, 382 B.R. 411, 426 (S.D. Ohio 2008).

{¶ 32} In the meantime, Buckeye had filed an action for damages in Greene County Common Pleas Court against Busch, Noland, and Statman in June 2007. In June 2010, the trial court granted Busch's motion for summary judgment, concluding that Buckeye's claims were barred by res judicata. The decision was based on the prior proceeding in the adversarial proceeding in *Kakde*. *See Buckeye Ret. Co., L.L.C., Ltd. v. Busch*, 2d Dist. Greene No. 2010-CA-51, 2011-Ohio-1125, ¶ 13. Specifically, the trial court held that "although Busch was not a party to the *Kakde* litigation, the relationship between Busch and Kakde was 'close enough' to include Busch within res judicata." *Id.* The trial court also concluded that "while the claims in the *Kakde* case were '*styled* differently' from the complaint against Busch, 'they reach the same conclusion.' " (Emphasis sic.) *Id.* The appeal was a final appealable order because the trial court had included a Civ.R. 54(B) certification, and Buckeye had also dismissed the claims against Noland and Statman without prejudice. *Id.*

{¶ 33} On appeal, we held that res judicata did not apply because Busch was not

in privity with Kakde. Specifically, Busch was not a party in the bankruptcy case and would not have been bound by the result in that case. *Id.* at ¶ 22. There was also no evidence that Busch actively participated in or had control over the prior lawsuit. *Id.* We, therefore, reversed the judgment and remanded it to the trial court for further proceedings. In August 2011, the Supreme Court of Ohio declined further review. S*ee Buckeye Retirement Co., L.L.C. v. Busch*, 129 Ohio St.3d 1450, 2011-Ohio-4217, 951 N.E.2d 1046.

**{¶ 34}** Following our remand, Buckeye filed another complaint in April 2011 and the trial court consolidated the 2007 and 2011 actions. As with the original complaint, the complaint filed in the 2011 action alleged fraudulent concealment against Busch, and tortious interference with contractual relations and aiding and abetting against Noland. Statman was sued based on its alleged respondeat superior liability for Noland's actions.

**{¶ 35}** During January 2014, the case was tried before a magistrate for three days. At trial, the magistrate heard evidence from John Busch, Thomas Noland, William Buseck and William Bodoh (expert witnesses for Buckeye), John Gluckner (a Buckeye account officer), and Jeffrey Morris and Alan Duvall (expert witnesses for the defense). In addition, the parties stipulated to admission of the trial testimony of Robert Burk and Suhas Kakde in the adversary proceeding in the case of *In re Kakde* (located at pp. 121-284 and pp. 465-553 of the transcript of that proceeding).[1]

**{¶ 36}** After considering the evidence, the magistrate issued a decision in January 2015, concluding that there was insufficient evidence to support the claims against Busch.

---

[1] This is the bankruptcy case that was discussed in our decision in *Busch*, 2d Dist. Greene No. 2010-CA-51, 2011-Ohio-1125.

The decision also concluded that Noland's advice was prudent and consistent with advice given by bankruptcy attorneys, and that Noland acted appropriately and without malice. The finding in Noland's favor additionally resolved the status of any claims against Statman. Buckeye then filed objections in January 2015 and supplemental objections in March 2015, after the transcript was filed. Busch, Noland, and Statman filed cross-objections in January 2015, and responded to Buckeye's objections and supplemental objections.

{¶ 37} In July 2016, the trial court overruled all objections and granted judgment in favor of Busch, Noland, and Statman. Buckeye timely filed a notice of appeal, and Busch Noland, and Statman filed cross-notices of appeal.

## II. Did the Court Err in Rejecting the Claims against Busch?

{¶ 38} Buckeye's First Assignment of Error states that:

The Trial Court Erred in Finding that Defendant John R. Busch Was Not Liable for Fraudulent Concealment and/or Fraudulent Representation.

{¶ 39} Under this assignment of error, Buckeye raises a manifest weight challenge to the trial court's decision that Busch was not liable for fraudulent concealment and misrepresentation. In this regard, Buckeye argues that Busch falsely inflated financial information on the BBCs, and that there was overwhelming evidence that Provident justifiably relied on the false BBCs to advance money to USAT and not accelerate the loan.

{¶ 40} " '[I]n order for an appellate court to reverse a decision as against the manifest weight of the evidence in a civil context, the court must determine whether the

trier of fact, in resolving evidentiary conflicts and making credibility determinations, clearly lost its way and created a manifest miscarriage of justice.' " *Brewer v. Dick Lavy Farms, L.L.C.*, 2016-Ohio-4577, 67 N.E.3d 196, ¶ 46 (2d Dist.), quoting *Alh Properties, P.L.L. v. Procare Automotive Serv. Sols., L.L.C.*, 9th Dist. Summit No. 20991, 2002-Ohio-4246, ¶ 12. " '[M]anifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion * * * ." *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19. "In a civil case, in which the burden of persuasion is only by a preponderance of the evidence, rather than beyond a reasonable doubt, evidence must still exist on each element (sufficiency) and the evidence on each element must satisfy the burden of persuasion (weight)." *Id.*

{¶ 41} In *Eastley*, the court stressed that "[i]n weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21. Thus, the court cautioned that:

"[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts. * * *

"If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."

*Id.*, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3. (Other citation omitted.)

{¶ 42} Before addressing the evidence, we note that the elements of fraudulent concealment and fraudulent misrepresentation are essentially the same. (Citations omitted.) *Gentile v. Ristas*, 160 Ohio App.3d 765, 2005-Ohio-2197, 828 N.E.2d 1021, ¶ 51 (10th Dist.) *Accord States v. Wing*, 11th Dist. Trumbull No. 2005-T-0145, 2006-Ohio-4423, ¶ 25. "Fraud may be committed not only by affirmative misrepresentation or concealment, but also by nondisclosure when there is a duty under the circumstances to disclose." *Gentile* at ¶ 51, citing *Parahoo v. Mancini*, 10th Dist. Franklin No. 97APE08-1071, 1998 WL 180539 (Apr. 14, 1998).

{¶ 43} To prove fraud, the party asserting the claim must establish: "(1) a representation (or concealment of a fact when there is a duty to disclose) (2) that is material to the transaction at hand, (3) made falsely, with knowledge of its falsity or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, and (4) with intent to mislead another into relying upon it, (5) justifiable reliance, and (6) resulting injury proximately caused by the reliance." (Citation omitted.) *Volbers-Klarich v. Middletown Mgt., Inc.*, 125 Ohio St.3d 494, 2010-Ohio-2057, 929 N.E.2d 434, ¶ 27. *Accord Seitz v. Harvey*, 2d Dist. Montgomery No. 25867, 2015-Ohio-122, ¶ 24. All these elements must be present, and the absence of any element precludes recovery. (Citations omitted.) *Westfield Ins. Co. v. HULS Am., Inc.*, 128 Ohio App.3d 270, 296, 714 N.E.2d 934 (10th Dist.1998).

{¶ 44} In rejecting the fraud claims, the magistrate thoroughly reviewed the evidence and concluded that Buckeye had presented insufficient evidence about what it would have done if it had known about the Bank One account and the inaccurate borrowing BBCs. In addition, the magistrate found that Buckeye had not proven its loss,

if any, based on the filing of the inaccurate statements.   In reaching these conclusions, the magistrate noted the statement of Buckeye's expert that it was impossible to determine what Provident would have done if it had known the facts, but that the expert, himself, would have called the loan.   The magistrate placed little weight on this testimony, noting that Provident did not appear to lose trust in Busch because Provident did not object to Busch staying on in his position with USAT during the bankruptcy.

{¶ 45} Furthermore, the magistrate placed great weight on the testimony of defense expert, Alan Duvall, who indicated that Provident and USAT had a long history of problems with the loan, including USAT's violation of covenants for years, which caused the loan to be in default.   Nonetheless, Provident did not call the loan, and chose to work with USAT in order to keep the company in business.   The magistrate also noted Duvall's testimony that, in fact, even though Busch provided inaccurate BBCs in 2003, the BBCs were actually understated, in terms of collateral, and Provident remained fully secured on the loan.   Magistrate's Decision, Doc. #264, p. 11.   And finally, the magistrate noted the lack of evidence that Provident relied on the BBCs in terms of keeping the loan in place.   *Id.*

{¶ 46} In challenging the decision as being against the manifest weight of the evidence, Buckeye points to testimony from Robert Burk, who stated that the bank relies on the accuracy of the financial information in determining what funds are available to a customer, and on the testimony of Noland, Kakde, and Busch, that Provident might accelerate the loan if it knew about the Bank One account.

{¶ 47} "The question of justifiable reliance is one of fact and requires an inquiry into the relationship between the parties."   (Citation omitted.)   *Crown Property Dev., Inc.*

*v. Omega Oil Co.*, 113 Ohio App.3d 647, 657, 681 N.E.2d 1343 (12th Dist.1996). "Reliance is justifiable if the representation does not appear unreasonable on its face and if there is no apparent reason to doubt the veracity of the representation under the circumstances. * * * However, reliance and responsibility must be balanced * * * ." (Citation omitted.) *Lapos Constr. Co. v. Leslie*, 9th Dist. Lorain No. 06CA008872, 2006-Ohio-5812, ¶ 21.

{¶ 48} We stressed these points in *Amerifirst Savings Bank of Xenia v. Krug*, 136 Ohio App.3d 468, 495, 737 N.E.2d 68 (2d Dist.1999). We further noted that " '[t]he rule of law is one of policy and its purpose is, while suppressing fraud on the one hand, not to encourage negligence and inattention to one's own interests. There would seem to be no doubt that while in ordinary business transactions, individuals are expected to exercise reasonable prudence and not to rely upon others with whom they deal to care for and protect their interests, this requirement is not to be carried so far that the law shall ignore or protect positive, intentional fraud successfully practiced upon the simple-minded or unwary.' " *Id.* at 495-496, quoting 50 Ohio Jurisprudence 3d, Fraud and Deceit, Section 132 (1984).

{¶ 49} The case before us does not involve a simple-minded or unwary participant. Instead, Provident was a sophisticated financial institution which chose to excuse repeated defaults, including ones occurring from the very beginning of the transaction. Moreover, Buckeye failed to present evidence from Provident that it would have accelerated the loan had it known of the Bank One account and the inaccuracies in the BBCs. Buckeye's response to this is that one cannot know what Provident would have done because Provident did not have all the facts at the time. However, Burk, who was

in charge of the loan, stated only that if Provident had known USAT was providing false information, it "would not have set well," and that the bank "*could* have accelerated the entire obligation and proceeded to move against the collateral." (Emphasis added.) Transcript of Adversary Hearing, p. 151.

{¶ 50} Burk further indicated that Provident would evaluate its options and various factors once it became aware of the situation, including where it was going to preserve the most value. *Id.* at p. 180. Additionally, Burk noted that while USAT was in default pretty consistently on loan covenants throughout 2002 and 2003, USAT was generating more receivables, and receivable collection had not been a problem for USAT, which historically had collected all its receivables. *Id.* at pp. 217-218, 224, and 271. According to Burk, the reporting of BBCs and review by the bank was an internal control the bank put in place to make sure the loan did not get out of balance with the collateral. *Id.* at p. 138.

{¶ 51} Consistent with Burk's testimony, Duvall (the expert the magistrate found credible), commented that:

Well note, [USAT has] been in loan covenant violation since day one. They've got serious financial issues. The bank is well aware of their serious financial issues. Audit reports – they're doing internal audits but the loan has been moved into you know the SAP division and yet, during this point in time, they allow this loan to go from March 31, 2003 to August 29, 2003, they allow it to grow $700,000.00 even though it's a troubled loan.

Now, then, still knowing it's a troubled loan, from August 29th to November 30th, it grows another $490,000.00. You know, if you, really, if

you graph this out it's almost a solid straight line up; about a $140,000 to 150,000 a month increase; so the question you have to raise is why did they allow that to grow during that point in time? And if there was something you know was there any factor after August 29th that happened that influenced them as opposed to what they knew back in March 31st, 2003. You see a growth the whole time and your conclusion has to be that * * * they saw the collateral base increasing, particularly with Delphi, and they were riding the pony * * * along with [USAT].

Transcript of Trial Proceedings, Vol. 6, pp. 806-807 (Testimony of Alan Duvall).

{¶ 52} Duvall further testified that nothing in his investigation demonstrated that the increase in the borrowing base was related to any inaccurate BBCs. *Id.* at p. 826. Duvall also said that instead of relying on the BBCs in terms of keeping the loan in place, Provident "actively ignored" the BBCs, "actively lent in excess of their lending authority and * * * knew there were issues with the borrowing base certificates back in November 2002. And they ignored all those issues." *Id.* at 827.

{¶ 53} Provident's response after learning of Busch's actions and the intended bankruptcy is also inconsistent with justifiable reliance. Provident did not accelerate the loan prior to bankruptcy, even though it learned of the intended bankruptcy several days before USAT filed. Provident also did not accelerate the loan when it learned of Busch's actions; instead, Provident requested an audit. Transcript of Adversary Hearing, p. 190; Transcript of Trial Proceedings, Vol. 1, pp. 85-87; Vol. 3, pp. 428-429.

{¶ 54} After the audit was conducted, Provident did not object to the use of emergency cash collateral, and subsequently consented to USAT's temporary and

permanent use of cash collateral in the bankruptcy proceeding, which allowed USAT to use, in part, Provident's capital to continue to operate. Transcript of Adversary Hearing, p. 153; Transcript of Trial Proceedings, Vol. 4, pp. 488-489; Vol. 5, p. 674. Provident also continued to work with USAT and with Busch during the bankruptcy proceedings; in particular, Busch was signing BBCs during the bankruptcy proceedings. Transcript of Proceedings, Vol. 3, pp. 425-426, and 433-435; Transcript of Adversary Hearing, p. 506. In addition, Provident did not ask for a trustee or receiver to be appointed during the bankruptcy. *Id.* at 433-434.

**{¶ 55}** Under the circumstances, we cannot say that the trial court's decision was against the manifest weight of the evidence. The trial court gave more weight to the testimony of certain witnesses, and this was a credibility issue, to which we accord substantial deference. *Bayes v. Dornon*, 2015-Ohio-3053, 37 N.E.3d 181, ¶ 54 (2d Dist.). Credibility of witnesses and the weight to be given their testimony are primarily matters for triers of facts to resolve. *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967).

**{¶ 56}** "Because the factfinder, be it the jury or, as in this case, the trial judge, has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). *Accord Bayes* at ¶ 53.

**{¶ 57}** As an additional matter, the trier of fact has the same ability to decide the credibility of expert witnesses and the weight to be given their testimony. *In re Estate of Secoy*, 19 Ohio App.3d 269, 274, 484 N.E.2d 160 (2d Dist.1984). (Citation omitted.) *See also Schutz v. Schutz*, 2d Dist. Darke No. 2016-CA-6, 2017-Ohio-695, ¶ 72; *Vance v. Vance*, 151 Ohio App.3d 391, 2003-Ohio-310, 784 N.E.2d 172, ¶ 100 (2d Dist.).

**{¶ 58}** This case does not present the exceptional situation in which the trier of fact " 'clearly lost its way and created a manifest miscarriage of justice.' " *Brewer*, 2016-Ohio-4577, 67 N.E.3d 196, at ¶ 46, quoting *Alh Properties*, 9th Dist. Summit No. 20991, 2002-Ohio-4246, at ¶ 12. Instead, the finding of lack of justifiable reliance was supported by more than adequate evidence.

**{¶ 59}** Because the lack of justifiable reliance is fatal to Buckeye's claim against Busch, we need not consider issues concerning whether the reliance proximately caused injury to Buckeye. *Volbers-Klarich*, 125 Ohio St.3d 494, 2010-Ohio-2057, 929 N.E.2d 434, at ¶ 27; *HULS Am., Inc.*, 128 Ohio App.3d at 296, 714 N.E.2d 934. We do note that Duvall, the defense expert, presented a detailed explanation of why no damages were caused, and the trier of fact gave great weight to that testimony.

**{¶ 60}** Based on the preceding discussion, the First Assignment of Error is overruled.

III.   Did the Court Err in Rejecting the Claims against Noland?

**{¶ 61}** Buckeye's Second Assignment of Error states that:

The Trial Court Erred in Finding that Defendant Thomas R. Noland Was Not Liable for Tortious Interference With Contractual Relations.

{¶ 62} Under this assignment of error, Buckeye contends, first, that the trial court applied the wrong legal standard in considering the tortious interference with contract claim against Thomas Noland. Specifically, Buckeye argues that the trial court incorrectly applied a legal malpractice standard instead of standards that apply to claims for interference with contractual relationships. Buckeye's second point is that the judgment in Noland's favor is against the manifest weight of the evidence. We will address these issues separately.

## A. Legal Standards

{¶ 63} As an initial point, we note that the magistrate specifically found in his decision that the claim against Noland was not a legal malpractice claim; instead, the claim was for tortious interference with a business relationship. Magistrate's Decision, Doc. #264, p. 12. The magistrate then concluded that Noland "acted professionally without malice and gave good-faith legal representation to USAT which is the standard in the State of Ohio." *Id.* at pp. 15-16. As a result, judgment was rendered in Noland's favor on Buckeye's claim.

{¶ 64} According to Buckeye, the trial court improperly used a standard from legal malpractice cases to decide if Noland was entitled to qualified immunity for his legal advice. Buckeye contends that the trial court, instead, should have used a seven-factor test from *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St.3d 171, 707 N.E.2d 853 (1999), to decide whether Noland lacked justification to interfere with Provident's contract.

{¶ 65} In *Siegel*, the Supreme Court of Ohio reaffirmed the existing elements of tortious interference with contract, holding that they are "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional

procurement of the contract's breach, (4) lack of justification, and (5) resulting damages." *Id.* at 171-172, paragraph one of the syllabus, affirming and following *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415, 650 N.E.2d 863 (1995), paragraph two of the syllabus.

{¶ 66} In *Siegel*, the Supreme Court of Ohio also stated that establishing the fourth element, lack of justification, would require "proof that the defendant's interference with another's contract was improper." (Citation omitted.) *Id.* at 172, paragraph three of the syllabus. To evaluate this particular point, the court adopted the following seven factor-test:

> In determining whether an actor has acted improperly in intentionally interfering with a contract or prospective contract of another, consideration should be given to the following factors: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

*Id.* at paragraph three of the syllabus, adopting Restatement of the Law 2d, Torts, Section 767 (1979).

{¶ 67} Like the case before us, *Siegel* involved allegations of contractual interference. However, the facts in *Siegel* were substantially different and had nothing to do with advice given during an attorney-client relationship. Specifically, in *Siegel*, an

attorney and her new law firm were sued for contractual interference because they solicited her former firm's clients. *Siegel*, 85 Ohio St.3d at 174, 707 N.E.2d 853. After reaffirming the existing elements of the tort of contractual interference and adopting Section 767 of the Restatement of Torts 2d, the court concluded that summary judgment had been improperly granted on behalf of the attorney and her new law firm. In this regard, the court reasoned that the record contained "unresolved issues of fact" concerning whether the attorney and her new law firm had used wrongful means in competing with the attorney's former law firm. *Id.* at 180.

{¶ 68} As noted, *Siegel* did not involve an attorney's legal advice to a client and allegations that a contractual interference claim could arise from that activity. Nonetheless, in arguing that the trial court used the wrong standard, Buckeye contends that *Siegel* "*recognized* a claim for tortious interference could be maintained against a law firm." (Emphasis added.) January 12, 2016 Brief of Appellant and Cross-Appellee, Buckeye Retirement Co., LLC, Ltd., p. 1. This is incorrect. *Siegel* did not establish a new theory of liability against law firms, and the involvement of attorneys was simply a factual matter in the case, not a basis for the claim.

{¶ 69} In fact, cases based on tortious interference of contract by attorneys and law firms existed well before *Siegel*. *See Sonkin & Melena Co., L.P.A. v. Zaransky*, 83 Ohio App.3d 169, 179, 614 N.E.2d 807 (8th Dist.1992) (in case involving law firm's claim against former attorney employee, court of appeals agreed with trial court that under totality of circumstances, former employee did not interfere with law firm's clients when he left the firm); *Shane, Shane & Summers Co., L.P.A. v. Caravona*, 8th Dist. Cuyahoga No. 52690, 1987 WL 20208, *2 (Nov. 19, 1987) (in suit involving former partners of law

firm, jury found that former law firm interfered with partners' contractual relations and prospective business advantage by persuading a doctor not to perform services for the partners' new firm); *Hilliard v. Lease*, 10th Dist. Franklin No. 93AP-1029, 1993 WL 538312, *3 (Dec. 23, 1993) (in case involving law firm's claims of tortious interference with business relationship by attorney who left firm and took clients, the court of appeals reversed dismissal of the case, concluding that the complaint adequately stated a claim).[2]

{¶ 70} In *Siegel*, the Supreme Court of Ohio did reject the suggestion of the attorney and her new firm that the Disciplinary Rules for lawyers justified their actions. In this regard, the court stated that a finding of tortious interference with contract is not precluded by the fact that clients have a right to discharge attorneys, or by the fact that attorneys may inform clients of their departure and willingness to provide services at a new location without violating ethical rules. *Siegel*, 85 Ohio St.3d at 176-178, 707 N.E.2d 853. The court also rejected the suggestion that "the propriety of an attorney's conduct for purposes of a tortious interference analysis should be determined solely by application of the Disciplinary Rules." *Id.* at 178. The court noted that violation of the Disciplinary Rules does not create a private cause of action, and that "the power to determine violations of the Disciplinary Rules is reserved" to the Supreme Court of Ohio. *Id.*

{¶ 71} As a result, the court concluded that "consistent with our adoption in *Kenty*

---

[2] In a later appeal, the court of appeals agreed with the trial court, which held a bench trial and decided that the facts did not support the business interference claim. *Hilliard v. Lease*, 10th Dist. Franklin No. 95APE04-473, 1996 WL 17578, *5 (Jan. 16, 1996). However, the court of appeals did reverse the trial court's finding that the attorney had no fiduciary duty to his former law firm. On remand, the trial court held that the attorney did not breach a fiduciary duty to the firm by improperly handling or delaying settlements in the cases of the clients he took, and the court of appeals affirmed this decision. *Hilliard v. Lease*, 10th Dist. Franklin No. 97APE05-637, 1997 WL 723232, *3 (Nov. 18, 1997).

of Restatement Section 766, which sets forth the elements of tortious interference with contract, the propriety of the appellants' conduct in contacting Siegel's clients and suggesting that they follow [the attorney] to [the new firm] should be determined by applying relevant legal tests as defined in Section 766 *et seq.* of the Restatement." *Id.*, citing *Kenty*, 72 Ohio St.3d 415, 650 N.E.2d 863. The court then adopted the seven-factor test mentioned above.

{¶ 72} In the case before us, the magistrate specifically found in his decision that the claim against Noland was not a legal malpractice claim, but was a claim for tortious interference with a business relationship. Magistrate's Decision, Doc. #264, p. 12. The magistrate then referred to *Shoemaker v. Gindlesberger*, 118 Ohio St.3d 226, 2008-Ohio-2012, 887 N.E.2d 1167, which held that "attorneys in Ohio are not liable to a third party for the good-faith representation of a client, unless the third party is in privity with the client for whom the legal services were performed." *Id.* at ¶ 9, citing *Scholler v. Scholler,* 10 Ohio St.3d 98, 462 N.E.2d 158 (1984), paragraph one of the syllabus. According to *Shoemaker*, "[t]his rule is rooted in the attorney's obligation to direct attention to the needs of the client, not to the needs of a third party not in privity with the client." *Id.*, citing *Simon v. Zipperstein*, 32 Ohio St.3d 74, 76, 512 N.E.2d 636 (1987). The court also commented that "[t[he necessity for privity may be overridden if special circumstances such as 'fraud, bad faith, collusion or other malicious conduct' are present." *Shoemaker* at ¶ 11, quoting *Zipperstein* at 76.

{¶ 73} *Shoemaker* involved a negligence claim that beneficiaries brought against an attorney for preparing a deed that resulted in increased tax for the estate. *Id.* at ¶ 1. The attorney had prepared the deed at the decedent's request, as she wanted to transfer

property to one child and reserve a life estate for herself. *Id.* at ¶ 2. When the estate was probated after her death, the remaining children found out that estate assets would have to be sold to pay taxes on the transfer. As a result, they brought an action for negligence against the attorney and an action for unjust enrichment against their brother. *Id.* at ¶ 3-4. In turn, the brother asserted a cross-claim against the attorney for negligence. *Id.* at ¶ 5.

{¶ 74} The trial court granted summary judgment in the attorney's favor, based on the lack of an attorney-client relationship, or lack of privity between the attorney and the children. *Id.* On appeal, the Supreme Court of Ohio held that the limited exception to the privity rule, i.e., for cases of fraud and malice, should not be expanded, *Id.* at ¶ 7. Thus, because the beneficiaries were not in privity and had not alleged fraud or malice, they did not have standing to file a negligence action against the attorney. *Id.* at ¶ 10.

{¶ 75} In rejecting expansion of the exceptions to privity, the court stressed that public policy justified adherence to the privity rule, because it primarily "is used to protect the attorney's duty of loyalty and the attorney's effective advocacy for the client." (Citations omitted.) *Id.* at ¶ 14. The court also focused on the fact that, in the estate planning context, attorneys would have conflicting duties and loyalties without the rule. *Id.* at ¶ 15. And finally, in a more general context, the court concluded that expanding the exceptions could cause "unlimited potential liability for the lawyer." (Citations omitted.) *Id.*

{¶ 76} In a recent decision, we thoroughly considered issues pertaining to the extent to which attorneys can be sued by third parties to the attorney-client relationship – a subject that was not involved in *Siegel*. *See Omega Riggers & Erectors, Inc. v.*

*Koverman*, 2016-Ohio-2961, 65 N.E.3d 210 (2d Dist.).

**{¶ 77}** *Omega* involved individual claims of minority shareholders against a corporate attorney. These claims arose from the attorney's involvement in a sale of assets of the closely held corporation. *Id.* at ¶ 3-4. The complaint sought damages against the attorney for breach of fiduciary duty, legal malpractice, and negligence. *Id.* at ¶ 16. When the attorney filed a motion for summary judgment based on lack of standing, the plaintiffs responded that they were in privity with the corporation, that the attorney had acted with malice, and that their injuries were not in common with other stockholders. *Id.* After the trial court granted summary judgment for the attorney, the plaintiffs appealed.

**{¶ 78}** Our decision initially noted that the attorney's summary judgment motion had argued, among other things, that the claims for breach of fiduciary duty and generic negligence were not independent claims, and that plaintiffs lacked standing to assert individual claims. *Id.* at ¶ 21. We then commented that only the lack of an attorney-client relationship, or a substitute for the relationship, had been appealed. *Id.*

**{¶ 79}** In discussing the issues, however, we first observed that "[a] claim against an attorney for actions taken in his professional capacity is a claim sounding in legal malpractice no matter how artfully the pleadings attempt to raise some other claim." *Omega*, 2016-Ohio-2961, 65 N.E.3d 210, at ¶ 22. We then stressed that:

" 'An action against one's attorney for damages resulting from the manner in which the attorney represented the client constitutes an action for malpractice * * *, regardless of whether predicated upon contract or tort or whether for indemnification or for direct damages. * * * Malpractice by any

other name still constitutes malpractice.' " *Pierson v. Rion*, 2d Dist. Montgomery No. 23498, 2010-Ohio-1793, ¶ 14, quoting *Muir v. Hadler Real Estate Mgmt. Co.*, 4 Ohio App.3d 89, 446 N.E.2d 820 (10th Dist.1982). Although the trial court correctly found that the only viable claim is one for legal malpractice, and that conclusion is not on appeal, we reiterate the nature of the claim to emphasize that the plaintiffs' various claims need to be analyzed in a legal-malpractice context.

*Omega* at ¶ 22.

**{¶ 80}** Notably, in *Pierson*, the complaint alleged "legal malpractice, fraud/fraudulent misrepresentation, negligent misrepresentation, and breach of contract" on the attorney's part. *Pierson* at ¶ 3. We concluded in *Pierson* that all these claims "were subsumed within [the plaintiff's] legal malpractice claim." *Id.* at ¶ 13.

**{¶ 81}** Based on the above authority, the magistrate could have concluded that the claims against Noland for interference with contract were, in fact, legal malpractice claims. Furthermore, if this were the case, the magistrate's resort to qualified immunity was appropriate.

**{¶ 82}** Courts have held that "not all fraudulent conduct committed by an attorney will fall under the umbrella of a general malpractice claim, although the elements of fraud must be specifically pled in the complaint." *Gullatte v. Rion*, 145 Ohio App.3d 620, 626, 763 N.E.2d 1215 (2d Dist.2000), citing *DiPaolo v. DeVictor*, 51 Ohio App.3d 166, 173, 555 N.E.2d 969 (10th Dist. 1988). In *DiPaolo*, the Tenth District Court of Appeals stated that "[i]n order to rebut that presumption [of good faith in handling a client's affairs] and sufficiently allege a cause of action for fraud against attorneys in a situation where the

gist of the complaint involves legal malpractice * * *, plaintiffs must have specifically alleged that defendants committed the actions for their own personal gain. To hold otherwise would be to undermine the purpose and focus of the malpractice statute." (Citation omitted.) *Id.* at 173.

{¶ 83} One theme asserted by Buckeye at trial was that Noland's alleged misconduct was based on a desire for personal gain, i.e., for payment of his firm's retainer. However, we commented in *Gullatte* that, despite the holding in *DiPaolo*, the Tenth District Court of Appeals "recently held that a desire to obtain a settlement and resulting contingent fee was not the type of personal gain that would support an action for fraud separate from a malpractice action." *Gullatte* at 626, citing *Endicott v. Johrendt*, 10th Dist. Franklin No. 99AP-935, 2000 WL 796576 (June 22, 2000). As a result, the Tenth District concluded in *Endicott* that the plaintiff's claim for fraud against her former attorneys was subsumed within her malpractice claim. *Endicott* at *5.

{¶ 84} In *Endicott*, the court of appeals did hold that one component of the plaintiff's claim for intentional infliction of emotional distress covered matters not within the scope of her former attorneys' representation, because it was based on their actions during an arbitration proceeding, well after their representation ended. *Id.* at *5. Specifically, the plaintiff alleged that the attorneys had falsely characterized her as an abuser of prescription drugs and had caused her physical distress. *Id.* However, there is no contention in the case before us that Buckeye's claim against Noland involved actions taken after Noland's representation of USAT ended.

{¶ 85} Applying the above discussion to the case before us, we conclude that the magistrate should have evaluated Buckeye's claims as ones for legal malpractice. All

the claims against Noland arose from " 'the manner in which' " Noland represented his client and should be considered in that context, regardless of how they were styled in the trial court. *Dottore v. Vorys, Sater, Seymour & Pease, L.L.P.*, 8th Dist. Cuyahoga No. 98861, 2014-Ohio-25, ¶ 37, quoting *Muir*, 4 Ohio App.3d at 90, 446 N.E.2d 820. *See also Omega*, 2016-Ohio-2961, 65 N.E.3d 210, at ¶ 22. While representing his client, Noland advised USAT to open a non-lender account and to deposit funds in the account in preparation for bankruptcy. If these actions caused damage, they would have been the subject of a legal malpractice action. Furthermore, even if Noland had been partially motivated by the prospect of funding a retainer, this was not the type of personal gain that would support an action beyond an action for malpractice. *Endicott* at *5; *Dottore* at ¶ 44 (desire to keep a client's business is not the type of personal gain elevating concealment from an act of malpractice to an act of fraud).

{¶ 86} Nonetheless, even if the magistrate erred in failing to consider the claim against Noland as one for legal malpractice, the magistrate did apply the correct standard for malpractice claims. As was noted, the magistrate applied qualified immunity, which prevents lawsuits against attorneys unless a party is in privity with the attorney. *Shoemaker*, 118 Ohio St.3d 226, 2008-Ohio-2012, 887 N.E.2d 1167, at ¶ 9.

{¶ 87} Furthermore, even if Buckeye's claim were solely based on interference with contractual or business relations, and *Siegel* applied, any error by the magistrate was harmless. As was noted, the factors in *Siegel* include "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f)

the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties." *Siegel*, 85 Ohio St.3d at 178-179, 707 N.E.2d 853.

**{¶ 88}** In concluding that Noland acted without malice, professionally, and in good faith, the magistrate did consider Noland's conduct and motives, the interests of Provident, the interests of USAT that Noland was attempting to advance, the time between Noland's advice and the alleged interference, and the relations between the parties. *See* Magistrate's Decision, Doc. #264, pp. 5, 9, and 12-16. Although the magistrate did not explicitly discuss the societal interests in qualified immunity for attorneys, the magistrate's citation to *Shoemaker* indicates that this issue was implicitly considered. In *Shoemaker*, the court stressed public policy, and the fact that the privity rule is primarily "used to protect the attorney's duty of loyalty and the attorney's effective advocacy for the client." *Shoemaker* at ¶ 14. As a result, consideration of societal interests was inherent in the magistrate's decision.

**{¶ 89}** Accordingly, we reject Buckeye's claim that the judgment should be reversed because the trial court used an incorrect standard to evaluate the claims against Noland.

## B. Manifest Weight Challenge

**{¶ 90}** Buckeye's second argument is that the judgment in Noland's favor is against the manifest weight of the evidence. As support for this, Buckeye relies on testimony from Busch and Kakde that Noland was aware that receivables would be used to fund the Bank One Account, and that Noland's response during their discussion was that Busch should "do what you have to do."

**{¶ 91}** Again, for us to reverse decisions based on manifest weight, we " 'must

determine whether the trier of fact, in resolving evidentiary conflicts and making credibility determinations, clearly lost its way and created a manifest miscarriage of justice.' " *Brewer*, 2016-Ohio-4577, 67 N.E.3d 196, at ¶ 46, quoting *Alh Properties*, 9th Dist. Summit No. 20991, 2002-Ohio-4246, at ¶ 12.

**{¶ 92}** In *Omega*, we stressed that only three methods could substitute for the essential requirement of an attorney-client relationship: "(1) the claimant is so situated that it is deemed in 'privity' with the actual client, (2) the attorney acted with malice toward the claimant such that an action for recovery is justified, or (3) the injury or damages caused by a tortfeasor to a corporate shareholder claimant are unique and distinct from those suffered by other shareholders, which justify a direct claim by the shareholder against the tortfeasor." *Omega,* 2016-Ohio-2961, 65 N.E.3d 210, at ¶ 23. The only potential exception that would apply in the case before us is malice. In this respect, the magistrate concluded that Buckeye's claim survived a motion to dismiss based on whether Noland's advice was based on "something other than sound legal advice." Magistrate's Decision, Doc. #264, p. 12.[3] At that point, Noland had not yet presented his case. However, after considering the entirety of the evidence, the magistrate concluded that Noland did not act maliciously, nor did he have an ulterior motive in connection with his legal advice. In addition, the magistrate found that Noland acted professionally and in good faith. *Id.* at pp. 15-16.

**{¶ 93}** In *Omega*, we discussed the subject of malice at length. *Id.* at ¶ 31-37.

---

[3] The parties and trial court referred to the motions made at the end of Buckeye's case as motions for "directed verdict," but since the trial was to the bench, the motions were for dismissal under Civ. R. 41(B)(2). The distinction is a matter of semantics, as the correct standards were applied.

We observed that normally, malice is defined as " '(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.' " *Id.* at ¶ 31, quoting *Preston v. Murty*, 32 Ohio St.3d 334, 336, 512 N.E.2d 1174 (1987). Because ill will, hatred, and revenge were not at issue, we further discussed only the issue of conscious disregard. *Id.* As in *Omega*, hatred, ill will, and revenge are not present in the case before us.

**{¶ 94}** Regarding "conscious disregard," we stressed in *Omega* that:

In the context of a legal-malpractice action, resolving whether an attorney's actions could be construed as "a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm" requires a subtle, but indispensable, distinction regarding applicable facts. An attorney should not suffer potential liability to third parties for advising and pursuing a client's non-criminal goals, even if those goals will subject the client to potential civil liability. If Omega, by direction of Foreman, its majority shareholder and president, intentionally decided to freeze out Cotter and Anthony, and Koverman was engaged to handle the legal process to do so, Koverman would not be liable in malpractice to the minority shareholders even though those facts arguably could be construed as the majority shareholder's conscious disregard of others' rights that probably would cause substantial harm, and even though those facts would expose the corporation and its majority shareholder to damages from the freeze out, as it did here. To hold otherwise would mean no attorney could

advise a client about, or legally participate in, the freeze out of a minority shareholder without incurring malpractice liability. But that is not the law.

*Omega*, 2016-Ohio-2961, 65 N.E.3d 210, at ¶ 32.

**{¶ 95}** In light of these observations, we held that "malice, as a substitute for an attorney-client relationship, cannot be predicated on actions by the attorney that the attorney is permitted to take, or even negligently may take, as part of the representation of plaintiffs' adversarial client. To constitute malice, the actions of the attorney must include a disregard of rights that the attorney, not the client, is required to protect and must include harm beyond that which legal action necessarily may inflict. In most circumstances, an attorney is not obligated to protect the rights of an adversary." *Id.* at ¶ 35.

**{¶ 96}** Viewing the evidence through this prism, we conclude that the judgment in Noland's favor is not against the manifest weight of the evidence. As a preliminary matter, we note that Buckeye's argument about manifest weight relies on incomplete testimony of Busch and Kakde, and ignores the testimony of Noland and the defense expert.

**{¶ 97}** According to Noland, the discussion on July 31, 2003, about opening the bank account, occupied only one percent of a very long meeting that was held when filing bankruptcy appeared imminent. Noland stated that he told USAT to open an account and "park" money in it in preparation for bankruptcy. Noland denied having any discussion and direction telling USAT it was to do anything other than build the account so it would be available if filing bankruptcy were necessary.

**{¶ 98}** The purpose of the account was to protect employees and preserve asset

values. Noland explained to USAT that if a business does not have cash available when it files bankruptcy, it cannot operate unless it obtains consent or an order from the court. If no cash is available, contracts go into default and employees will walk out the door with equipment, product, and whatever they can take, if they have not been paid. In that situation, the chance of reorganization ends before it has a chance to succeed.

{¶ 99} Noland also denied that Busch had said at the meeting that he was going to put receivables into the non-lender account. Transcript of Trial Proceedings, Vol. 2, p. 199. Noland believed that Busch had said receivables were the source of cash that USAT had to put into that account. However, Noland also stressed that he stated at the meeting "that Mr. Kakde or other sources should be explored to fund that account * * *." *Id.* at p. 201. In addition, Noland told Busch that if he were to obtain a receivable he turned into cash, Busch would have to accurately report that. *Id.* at p. 217. Finally, Noland told Busch that if Provident asked about a secondary bank account, Busch should reveal the account.

{¶ 100} USAT's president, Kakde, was present during the July 31, 2003 meeting. Kakde testified that a discussion occurred during the meeting about opening a bank account. According to Kakde, Noland indicated that opening a bank account would be a breach of contract, but that a breach was not illegal; USAT had already breached many covenants and this would just be another one. Concerning discussion about money for the account, Kakde testified that:

> * * * I don't know exactly how it transpired, but my recall is about reporting
>
> to the bank, if you put the money in that account, how am I going to report
>
> that to Provident, because all source of money is receivables only, you

know. * * * John [Busch] asked, you know, this is the borrowing base, what should I do with it and all that. Tom said, I'm not an accountant, you do what you have to do. John started running the scenario again and Tom said, I don't understand. And I said, John, I don't understand that either, what you need to do is if you have any questions about anything, touch base with Tom, get an answer from Tom. Because between you two, I'm pretty sure you'll be able to resolve it. And my patter [sic] is full, I need to take care of other issues.

Transcript of Adversary Proceeding, p. 489.

{¶ 101} After the July 31, 2003 meeting, the next time that Noland met with USAT was when he handled litigation involving Borg Warner in November 2003. When the Borg Warner issue came up, they discussed the Chapter 11 proceeding. However, there was no evidence that Busch contacted Noland about anything pertaining to BBCs until mid-December 2003, when Busch called Noland and said he was uncomfortable with a report he was to submit to the bank. At that time, Noland told Busch to consult with Kakde and have Kakde sign it, if he would. Transcript of Trial Proceedings, Vol. 2, pp. 285-286.

{¶ 102} Notably, Busch signed almost all the BBCs after the July 31, 2003 meeting, other than ones on December 9 and December 16, 2003. Kakde signed these two BBCs. According to Kakde, Busch only told him of an issue about signing after Kakde had signed the BBC on December 16. Kakde indicated that Busch's concern was that USAT's collateral might not have the value due to the Delphi cancellation.[4] At that point,

---

[4] Delphi's final offer of $150,000 rather than the anticipated $2,000,000 on the contract

Kakde told Busch that they would talk to Noland. Transcript of Adversary Proceeding, p. 505. The bankruptcy was filed shortly thereafter.

{¶ 103} Noland testified that he first learned of borrowing base issues with USAT's account from Provident's attorney in December 2003, after USAT told Provident it was going to declare bankruptcy. Transcript of Trial Proceedings, Vol. 2, p. 282. Kakde also testified that he was shocked when he learned that Busch had provided inaccurate information on the BBCs. Transcript of Adversary Proceeding, p. 548. Kakde said that he had trusted Busch and still trusted him. He went on to say that "I did not understand the extent of [Busch's] genuine, genuine lack of understanding. There's clearly a gap between what Mr. Noland wanted to see and could not fully articulate and what Mr. Busch understood he should do to keep that account from Provident, to keep the Bank One account from Provident. That's how I see the situation." *Id.* at pp. 548-549.

{¶ 104} In addition, Busch never testified that Noland told him to put receivables in the account or to falsify documents. His testimony was that in order to open an account and fund it, it was not possible to record the receivables accurately without Provident knowing. Transcript of Trial Proceedings, Vol. 1, p. 128. Busch then stated that "You couldn't do both; so what I did was I opened the account and did not record the information on the books and records of USAero Team to keep it secret. Now *I thought* when Mr. Noland said to do what you needed to do that is the only thing I could see that could be done." (Emphasis added.) *Id.*

{¶ 105} At a minimum, the above testimony demonstrates ambiguity about was what meant by "do what you have to do." At a maximum, there are credibility issues that

cancellation was received on December 15, 2003.

were resolved in Noland's favor by the finding that he acted professionally and in good faith. Certainly, if one believes Noland and Kakde, no discussion or instruction about inaccurately reporting BBCs was given. And, even Busch's testimony is based on what he "thought" was meant by Noland's statement.

**{¶ 106}** Buckeye contends that the advice to "do what you have to do" was not sound legal advice because making false statements to banks to influence lending is a crime under 18 U.S.C. 1014. However, that assumes Noland's statement was both unambiguous and undisputed. It was not, and as we have stressed, triers of fact primarily resolve witness credibility and weight, and we give substantial deference to the fact-finder's determination. *DeHass*, 10 Ohio St.2d at 231, 227 N.E.2d 212; *Bayes*, 2015-Ohio-3053, 37 N.E.3d 181, at ¶ 54. The reason for this is that "the factfinder * * * has the opportunity to see and hear the witnesses * * *." *Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, at *4. Furthermore, "[t]he fact that the evidence is subject to different interpretations does not render the judgment against the manifest weight of the evidence." (Citation omitted.) *Seitz*, 2d Dist. Montgomery No. 25867, 2015-Ohio-122, at ¶ 41.

**{¶ 107}** We also note that Noland presented testimony from an expert bankruptcy practitioner (Jeffrey Morris), who testified that all of Noland's conduct, including his pre-bankruptcy advice, was appropriate and prudent, and was within the standard of care for bankruptcy attorneys in Ohio. In addition, Provident's expert (William Bodoh) did not indicate that Noland did anything "unethical or illegal." Transcript of Trial Proceedings, Vol. 4, p. 562. Bodoh acknowledged that setting up a non-lender account was pretty routine in pre-bankruptcy proceedings, but was critical of the length of time the account

was open. Bodoh also criticized Noland's suggestion to Busch that "false and fraudulent" statements be submitted to Provident. *Id.* at p. 565. However, this criticism assumed the truth of facts that were actually disputed. Again, the trier of facts was entitled to assess the credibility of expert witnesses and what weight to give their testimony. *In re Estate of Secoy*, 19 Ohio App.3d at 274, 484 N.E.2d 160; *Schutz*, 2d Dist. Darke No. 2016-CA-6, 2017-Ohio-695, at ¶ 72.

**{¶ 108}** Based on the preceding discussion, we conclude that the trial court's judgment as to Noland's lack of liability was not against the manifest weight of the evidence. We also note, for the reasons previously expressed, that our decision would be the same even if we evaluated the manifest weight issue based on *Siegel* and the seven-factor test for deciding if interference with a contract lacks justification.

**{¶ 109}** Based on the preceding discussion, the Second Assignment of Error is overruled.


IV.  Respondeat Superior

**{¶ 110}** Buckeye's Third Assignment of Error states that:

The Trial Court Erred in Finding that Defendant Statman, Harris & Eyrich, LLC Was Not Vicariously Liable under Respondent Superior for the Conduct of Its Employee, Defendant Thomas R. Noland.

**{¶ 111}** Under this assignment of error, Buckeye argues that if Noland is liable for tortious interference with the contract between Provident and USAT, then Statman is also liable under the theory of respondeat superior. Buckeye concedes that if Noland is not liable, then Statman has no vicarious liability. We agree.

**{¶ 112}** "Respondeat superior speaks only to the vicarious liability of an *employer*; it does not simultaneously create an express cause of action against individual agents and servants of the employer. 'Respondeat superior' means '[l]et the *master* answer,' and [has been defined] * * * as the doctrine holding 'a *master* * * * liable in certain cases for the wrongful acts of his servant, and a *principal* for those of his agent.' " (Emphasis sic.) *Hauser v. Dayton Police Dept.*, 140 Ohio St.3d 268, 2014-Ohio-3636, 17 N.E.3d 554, ¶ 11, quoting Black's Law Dictionary 1546 (3d Ed.1933).

**{¶ 113}** Because the judgment pertaining to Noland's lack of liability is being affirmed, the Third Assignment of Error is without merit and is overruled.

## V. Cross-Appellants' Assignments of Error

### A. Noland's and Statman's Assignments of Error.

**{¶ 114}** Noland and Statman have filed the following assignments of error, as Cross-Appellants:

(1)  The Trial Court Erred in Overruling Noland and SH&E's Motions to Dismiss; Motions for Summary Judgment; Motion to Dismiss as a Matter of Law Whether Language of the Asset Sale Agreement is Ambiguous; and Motion for Directed Verdict, Specifically in Regard to Determining Whether Buckeye Had Purchased from Provident the Tort Rights Asserted Against the Defendants in the Underlying Matter.

(2)  The Trial Court Erred in Overruling Noland and SH&E's Motion for Summary Judgment and Motion for Directed Verdict, Specifically in Regard to Determining that Noland Was Not USAT's Agent for Purposes of

the Transactions at Issue and Could Be Prosecuted for Tortious Interference With the Contract Between USAT and Provident.

{¶ 115} Under these assignments of error, Noland and Statman present two main arguments. The first is that Buckeye did not purchase the right to sue Noland and Statman based on the terms of the loan acquisition documents and applicable law. They, therefore, contend that the trial court should have dismissed the complaint, granted summary judgment in their favor, or granted their motion for "directed verdict."

{¶ 116} The second argument is that Noland and Statman could not be sued for tortious interference with the contract between Provident and USAT because Noland was acting as USAT's agent at all relevant times and was legally deemed a party to the contract. Since a party cannot tortuously interfere with its own contract under Ohio law, Noland and Statman contend that the trial court erred by failing to grant their motion for summary judgment and motion for "directed verdict," both of which raised these points.

{¶ 117} Because the trial court's judgment in favor of Noland and Statman is being affirmed, these assignments of error are moot and need not be considered. *See* App.R. 12(A)(1)(c).

## B. Busch's Assignment of Error

{¶ 118} Busch has filed the following assignment of error:

The Trial Court Erred in Overruling Busch, Noland, and SH&E's Various Motions Asserting Plaintiff Buckeye Retirement Co., LLC, Ltd. Did Not Purchase from The Provident Bank the Tort Rights Asserted Against the Defendants in the Underlying Matter and Did Not Have the Ability to

Pursue the Claim Against the Defendants.

**{¶ 119}** For the reasons just discussed, this assignment of error is moot and need not be considered, pursuant to App.R. 12(A)(1)(c).

## VI. Conclusion

**{¶ 120}** All of Buckeye's assignments of error having been overruled, and the assignments of error of Cross-Appellants, Noland, Statman, and Busch having been rendered moot, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

FROELICH, J. and TUCKER, J., concur.

Copies mailed to:

James C. Carpenter
Vincent I. Holzhall
George D. Jonson
G. Todd Hoffpauir
John D. Smith
Andrew P. Meier
Ira H. Thomsen
Hon. Michael A. Buckwalter