[Cite as *In re C.T.*, 2021-Ohio-4023.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

| | |
|---|---|
| IN RE: C.T., C.T., and C.T. | :<br>:<br>:    Appellate Case No. 29208<br>:<br>:    Trial Court Case Nos. 2018-5508, 2018-<br>:    5509, and 2018-5510<br>:<br>:    (Appeal from Common Pleas Court-<br>:    Juvenile Division)<br>: |

. . . . . . . . . . .

## O P I N I O N

Rendered on the 12th day of November, 2021.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by HEATHER N. KETTER, Atty. Reg. No. 0084470, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
    *Attorney for Appellee, Montgomery County Children Services*

ROBERT ALAN BRENNER, Atty. Reg. No. 0067714, P.O. Box 340214, Dayton, Ohio 45422
    *Attorney for Appellant, Mother*

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Mother appeals from a juvenile court judgment awarding legal custody of her three children, Charles, Connie, and Clark, to non-relative care-givers, Tina and David.[1] In her sole assignment of error, Mother contends that the juvenile court erred in awarding custody to Tina and David because, at the time of the second custody hearing, two of the children (Connie and Clark) wished to return home to Mother. In addition, Mother argues that she had completed her case plan requirements.

{¶ 2} After considering the record and applicable law, we conclude that Mother's assignment of error is without merit. Accordingly, the juvenile court's judgment will be affirmed.

## I. Facts and Course of Proceedings

{¶ 3} In this appeal, three dockets were submitted, one for each child. Because the dockets are essentially the same, we will refer to the docket in Case No. 2018-5509, which is the docket for the eldest child, Charles. We note that Charles and Connie have the same father (E.J.), and Clark's father is Y.I. Neither father has appealed from the legal custody award.

{¶ 4} In early November 2018, Montgomery County Children Services ("MCCS") filed complaints based on abuse, neglect, and dependency involving the three children.

---

[1] To avoid excessive use of initials, which can become confusing, we will refer to C.T.1, C.T.2, and C.T.3, respectively, as Charles, Connie, and Clark. These are not their real names. The birth years of the children, respectively, are 2006, 2007, and 2012. At the time of the juvenile court's legal custody award in June 2021, the children were ages 14, 13, and nine years old. We will also refer to the legal custodians as Tina and David. Again, these are not the real names.

This was a refiling of prior complaints that could not be adjudicated within the statutory time.

{¶ 5} According to the complaint in Charles's case, MCCS received a referral on September 4, 2018, alleging that Mother's house was in a deplorable condition and that there were concerns about Mother's lack of supervision of the children and the lack of utilities. Complaint (Nov. 21, 2018), p. 1.

{¶ 6} After some difficulty making contact with Mother, MCCS caseworker Beth, called the police and was able to enter Mother's house with Mother's permission on September 5, 2018. When Beth entered the home, there was an overwhelming smell. Beth and the officers observed trash, clutter, old food, clothing, and other items, and the house was infested with roaches. *Id.* at p. 2. The refrigerator did not work, did not contain any food, and was also filled with roaches. While the freezer contained food, it did not work, also had roaches, and the food was rotting. *Id.* In addition, Mother admitted that she worked third shift and had left the children unattended in the home while she was at work. *Id.* At the time of their removal, Charles was 12 years old; Connie was 10 years old, and Clark was six years old.

{¶ 7} Charles was placed with an adult sister, C.B., on a safety plan. However, she was unable to care for all the children. Because MCCS was unsuccessful in establishing a safety plan for the two other children, the police had to place them in MCCS's custody. Mother was also arrested and charged with three counts of child endangerment. *Id.* In the complaint, MCCS asked for an award of temporary custody to C.B. or, alternatively, to MCCS.

{¶ 8} After the complaint was filed, the juvenile court scheduled an interim order

hearing for November 21, 2018, appointed counsel for the children and Mother, and appointed a guardian ad litem ("GAL"). The complaint was also amended to reflect an alternative disposition of temporary custody to Tina.

{¶ 9} After the hearing, a magistrate issued an interim order on November 21, 2018, granting temporary custody of the three children to Tina, by agreement, and Mother was granted monitored parenting time with the children. At that point, the GAL had filed a report recommending that Tina be given temporary custody. Among other things, the GAL noted that "this is one of the worst dirty house cases the undersigned has ever seen." GAL Report and Recommendations (Nov. 21, 2018), p. 3. The GAL further noted that this was the third time Mother's children had been removed. The children were returned the first time after six months, and the second time after one year. *Id.* Charles and Connie also had special needs; Connie was on the autistic spectrum but high-functioning, and Charles had hearing loss in one ear and suffered from epilepsy. *Id.* at p. 4-5. Mother's adult daughter, C.B., who had been caring for Charles, also had said that Mother's problems were deeply ingrained and that the children should not be returned to Mother. *Id.* at p. 5.

{¶ 10} In the initial case plan filed on January 18, 2019, the caseworker observed that Mother had a history with Children's Services in Virginia, where the children had been removed and placed in foster care. Furthermore, Mother also had a history with MCCS dating back to October 2015, due to reports of concern for physical abuse and conditions in the home. Case Plan (Jan. 18, 2019), p. 3. The caseworker further stated that Mother appeared to be in denial about being the one responsible for the home's conditions and had also expressed a lack of understanding over why she should not have

left her children alone overnight while working, leaving a 12-year old child in charge. *Id.* Mother additionally reported mental health diagnoses of anxiety and depression and some health conditions. *Id.* Finally, the caseworker stressed that the children had excessive absences and tardiness in school such that they were behind their normal age group. *Id.*

{¶ 11} The case plan required Mother to obtain a mental health assessment within 90 days and follow any recommendations, to successfully complete a parenting/ psychological evaluation within 90 days and demonstrate compliance with recommendations, and to demonstrate an ability to maintain a suitable environment meeting the children's basic needs. This would include safe, sanitary, and stable housing; age appropriate supervision of the children at all times by a responsible adult; independent housing with Mother's name on the lease and the ability to afford long-term housing for the family; and nutritional food with means for sanitary preparation and serving. *Id.*

{¶ 12} Mother's additional case plan requirements were as follows: to obtain and maintain a legal source of sufficient income to meet the family's needs, along with verification through pay stubs; to assure the children had sufficient medical coverage; to assure that the children attended school daily without unexcused or excessive absences or tardiness; to attend to the children's personal hygiene and provide clean, suitable clothing; to sign releases of information; to cooperate with announced and unannounced home visits; to consistently visit the children; and to work with Mother's doctors to address any physical concerns. *Id.* at p. 3-4.

{¶ 13} The plan also contained requirements for E.J., who had been very

estranged from his children, Charles and Connie, did not have his own housing, and did not have a demonstrable income. *Id.* at p. 7. Finally, Y.I., Clark's father, who lived out of state, was to participate in the Interstate Compact of the Placement of Children process to try to obtain custody. *Id.* at p. 2.

{¶ 14} After holding an adjudicatory and dispositional hearing on January 22, 2019, the magistrate filed a decision and judge's order finding the three children neglected, dependent, and abused. Magistrate's Decision and Judge's Order (Jan. 22, 2019), p. 2. In this regard, the magistrate cited R.C. 2151.04(C), R.C. 2151.03(B), and R.C. 2151.03(A)(2). *Id.* Specifically, the children were endangered due to the home's condition and therefore were neglected and abused. *Id.* Temporary custody of all three children was granted to Tina and the parents were given parenting time. *Id.* at p. 4. All three parents were also ordered to pay child support. *Id.* at p. 7-8. On the day of the hearing, the GAL filed an updated report, noting that all three children were residing with their foster parents, Tina and David, and were doing well.

{¶ 15} On August 9, 2019, MCCS filed an amended case plan, amending the goals and objectives and adding services, because the parenting/psychological assessment had been completed. According to the case plan, Mother had been working with Eastway Behavioral Health for mental health services but was resistant to treatment recommendations. In June 2019, Mother decided to change to Patterson Park Health Center. Multiple parties had reported that Mother had increasing struggles with her behavior and interaction with others, and she had openly stated her intent to terminate the children's relationship with family members and others because she perceived she had been "done wrong" by them. Amended Case Plan (Aug. 9, 2019), p. 2. Mother had

also begun parenting classes but struggled with being appropriate with and in front of her children. *Id.*

{¶ 16} Among the additions to Mother's services were specialized treatment for personality disorder weekly for 24 months; individual psychotherapy weekly for 24 months; parenting skills training for 12 months; and that Mother not engage in conflicts with others in front of the children or place them in the middle with regard to her conflicts. *Id.* at p. 12. On September 9, 2019, the court approved the amended case plan.

{¶ 17} On September 12, 2019, MCCS filed a motion and affidavit with the court, asking that legal custody of the children be granted to Tina and David. In the affidavit, the caseworker, Beth, stated that Mother had not made significant progress on her case plan objectives. Although Mother had engaged in mental health treatment and was enrolled in parenting classes, she had not displayed better parenting choices. Motion and Affidavit for Legal Custody (Sep. 12, 2019), Affidavit, p. 1. And despite knowing that her negative behaviors upset the children, Mother continued to initiate negative interactions with her adult daughter, with a maternal aunt, with E.J., and with Tina and David in front of the children. *Id.*

{¶ 18} The affidavit further noted that E.J., the legal father of Charles and Connie, had stopped cooperating and visiting, did not have income or housing, and had failed to complete an assessment for mental health services. *Id.* The children were doing well in the foster home, and Tina and David were willing to provide for the children on a permanent basis. *Id.* at p. 2.

{¶ 19} A semi-annual administrative review ("SAR") was also filed on September 12, 2019, outlining the same issues, including more detail about Mother's negative

behavior, including verbal abuse of Tina and Mother's inappropriate comments to the children about listening to Tina, that Tina was bad, that they should not listen to Tina, and that Tina only wanted the children for the money.   SAR (Sept. 12, 2019), p. 3.

{¶ 20} On September 27, 2019, Mother filed a motion for temporary or legal custody with protective supervision or, alternatively, for a first extension of temporary custody to Tina and David.   Mother also requested unsupervised visitation.   The GAL then submitted another report on October 2, 2019.   The GAL noted that while Mother had made considerable progress on several fronts, he could not recommend returning custody to Mother at that time.   GAL Report (Sept. 27, 2019), p. 9.   The GAL recommended giving Tina and David legal custody and increasing Mother's visitation. *Id.*

{¶ 21} On October 2, 2019, the magistrate filed an order requiring that an interstate home study be conducted for Clark's father, Y.I.   The magistrate also set a dispositional hearing for December 4, 2019.   Subsequently, in mid-October 2019, MCCS filed a motion to show cause against E.J., because he had not paid child support as ordered.

{¶ 22} After the dispositional hearing was held, the magistrate filed an order on December 5, 2019, continuing MCCS's protective supervision and granting Mother two hours of supervised visitation per week.   The matter was then continued until March 6, 2020, because the dispositional hearing had not yet concluded.   Following a contempt hearing on January 9, 2020, E.J. was held in contempt and was sentenced to 30 days in jail, with the sentence being suspended on the condition that he pay support.

{¶ 23} On March 9, 2020, the GAL filed another report, based on his most recent visitation with Mother and the children.   While the children had visited with Mother in her

home, the GAL was concerned because Mother had been pressuring the children to say that they wanted to live with her and had been asking them questions and taking notes. The GAL noted that Mother's house was adequate for the children and that Mother was working.

{¶ 24} However, while Mother was in a much better place than when the case began, the GAL still had concerns. Mother had very little family support and a long history of problems. GAL Report (March 9, 2020), p. 6. Mother also minimized the conditions causing removal and indicated that she would minimize contact with other family members and Tina and David if she received custody. *Id.* at p. 6-7. The GAL was concerned that the children would be isolated, especially at a time when they were most vulnerable. *Id.* at p. 7. Due to these concerns, the fact that the children had "bloomed" in their current situation, Mother's lack of insight and prior actions indicating that her mental health and parenting skills were questionable, and concern over whether Mother could maintain her current path, the GAL recommended that Tina and David receive legal custody and that Mother be allowed expanded visitation. *Id.*

{¶ 25} The dispositional hearing continued on March 6, 2020. Following the hearing, the magistrate concluded that Mother was not able to adequately care for the children on a full-time basis and that neither father was able to adequately care for them. Magistrate's Decision and Judge's Order (March 18, 2020), p. 2. After discussing the facts of the case, the magistrate held that it was in the children's best interest to remain in the custody of Tina and David, with MCCS to have protective supervision for six months. *Id.* at p. 6. Mother was also granted progressive parenting time, beginning with three hours of unsupervised parenting time on April 6, 2020, and ending up with the

court's standard order of parenting time on May 18, 2020, unless Mother created turmoil or conflict with the children or their custodians. In that event, Mother's visits would be moved to Erma's House. *Id.* at p. 7. The magistrate also denied Mother's request for an extension of temporary custody.

{¶ 26} Mother filed objections to the magistrate's decision on April 5, 2020, and supplemental objections on June 18, 2020, after hearing transcripts were filed. On March 5, 2021, MCCS filed a SAR indicating that Mother was not working due to back surgery in November 2020. At the time of the SAR, Mother was living with her sister and had also been diagnosed with a brain tumor, with an MRI scheduled for April 2021. *Id.* at p. 15. Mother was visiting with the children two hours a week at the daycare where Tina worked. *Id.* at p. 15-16. There was continuing tension in the relationship between Tina and Mother and continued concerns that Mother had engaged the children in inappropriate adult conversations. *Id.* at p. 15 and 17.

{¶ 27} On June 22, 2021, the juvenile judge issued an order overruling Mother's objections and finding it was in the children's best interest to grant legal custody to Tina and David. Like the magistrate, the court granted progressive parenting time, contingent on Mother's refraining from creating turmoil or conflict with the children or the custodians. Both fathers were given parenting time as agreed to by the parties.

{¶ 28} Mother then timely appealed from the juvenile court's judgment. As noted, neither father appealed.

I.   Award of Custody to a Non-Relative

{¶ 29} Mother's sole assignment of error states that:

The Juvenile Court Erred When It Awarded Legal Custody of the Children in This Case to a Non-Relative.

{¶ 30} In support of this assignment of error, Mother contends that the juvenile court erred in the custody award because it was in the children's best interest to at least extend temporary custody. Mother notes that two of the children wished to reunify with her by the time of the second hearing, and that she had completed her case plan objectives.

{¶ 31} Before we consider these points, we will briefly outline the standard of review as well as the law pertaining to awards of legal custody under R.C. 2151.353(A)(3), which applies here.

A.  Standard of Review

{¶ 32} In reviewing legal custody decisions, we will reverse only if the lower court has abused its discretion.  *In re I.R.*, 2d Dist. Montgomery No. 28160, 2019-Ohio-2037, ¶ 7.  An abuse of discretion "implies that the court's attitude is unreasonable, arbitrary or unconscionable."  *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).  However, "most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary."  *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

{¶ 33} Furthermore, in reviewing trial court decisions, we have often stressed that "[c]redibility of witnesses and the weight to be given their testimony are primarily matters for triers of facts to resolve."  *Buckeye Retirement Co., LLC v. Busch*, 2017-Ohio-4009,

82 N.E.3d 66, ¶ 55 (2d Dist.), citing *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). This is "[b]ecause the factfinder, be it the jury or, as in this case, the trial judge, has the opportunity to see and hear the witnesses * * *." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). As a result, "[t]he decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *Id.*

B. Legal Standards Applying to R.C. 2151.353(A)(3) Awards of Legal Custody

{¶ 34} After a child has been adjudicated a dependent, neglected or abused child, the juvenile court may, as an alternative to permanent custody, "award legal custody of a dependent child to a parent or to any other person who asks for legal custody or is proposed as a legal custodian." *In re R.H.B.*, 2d Dist. Clark No. 2015-CA-12, 2016-Ohio-729, ¶ 7, citing R.C. 2151.353A)(3). A legal custody award "vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities." R.C. 2151.011(B)(21).

{¶ 35} Unlike permanent custody awards, "an award of legal custody of a child does not divest parents of their residual parental rights, privileges, and responsibilities." *In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, 843 N.E.2d 1188, ¶ 17. As a result, a "preponderance of the evidence" standard applies to the juvenile court's decision. *In re C.W.*, 2d Dist. Montgomery No. 28781, 2020-Ohio-6849, ¶ 6, citing *In re A.W.*, 2d Dist.

Montgomery No. 21309, 2006-Ohio-2103, ¶ 6. "Preponderance of the evidence simply means 'evidence which is of a greater weight or more convincing than the evidence which is offered in opposition to it.' " *In re Starks*, 2d Dist. Darke No. 1646, 2005-Ohio-1912, ¶ 15, quoting *Black's Law Dictionary* 1182 (6th Ed.1998).

**{¶ 36}** In making such a legal custody decision, the court "must do so in accordance with the 'best interest of the child' standard set forth in R.C. 3109.04(F)(1)." *In re D.S.*, 2d Dist. Clark No. 2013-CA-51, 2014-Ohio-2444, ¶ 9, citing *In re Poling*, 64 Ohio St.3d 211, 594 N.E.2d 589 (1992), paragraph two of the syllabus, and R.C. 2151.23(F)(1) (pertaining to the exercise of juvenile court jurisdiction). These factors "include such things as the parents' wishes; the child's wishes, if the court has interviewed the child; the child's interaction with parents, siblings, and others who may significantly affect the child's best interest; adjustment of the child to home, school, and community; and the mental and physical health of all involved persons." *Id.* at ¶ 9, citing R.C. 3109.04(F)(1). "While 'blood relationship' and 'family unity' (i.e., a preference for a family member) are factors to consider when determining a child's best interest, neither one is controlling. *Id.*, citing *In re S.K.G.*, 12th Dist. Clermont No. CA2008–11-105, 2009-Ohio-4673, ¶ 12. (Other citations omitted.)

**{¶ 37}** Additionally, R.C. 2151.414(D)(1) requires the court to consider certain factors in deciding the best interest of children in cases like the present. *Starks* at ¶ 37.

## C. Discussion

**{¶ 38}** Mother argues that the court should at least have extended temporary custody. She also notes that two of the children wished to live with her and that she had

completed her case plan objectives.

{¶ 39} In awarding legal custody to Tina and David, the juvenile court reviewed all the factors in R.C. 3109.04(F)(1), as well as those in R.C. 2151.414(D)(1), to decide the best interest of the children. We will do the same, focusing on the hearing testimony in addition to the record as outlined above, and the particular factors that are pertinent here. The individuals who testified at the two hearings included: Beth, the MCCS caseworker; Kelly, an intervention specialist with Horace Mann Elementary School who had regular contact with Charles and Connie and who had Connie in her class during fourth and fifth grade; Mother's adult daughter, C.B.; Tina; Scott Burka, who had been the foster parent in Virginia for Charles and Connie for six months in 2011 and for all three children for about 12 months in 2012 to 2013; Anthony Raterman, a counselor who treated Mother; and Mother.

(1)  R.C. 3109.04(F)(1) Factors

(a) The parents' wishes

{¶ 40} Mother wished to have custody of the children returned to her, but if that did not occur, then she wanted the court to grant a temporary extension and unsupervised and overnight visitation at her home. Transcript of Proceedings ("Tr."), p. 244 and 245-255. Mother also did not want custody of Clark to be given to Y.I., because she did not want the children separated. *Id.* at p. 247. Y.I. strongly wanted the children to remain together in Tina and David's home; if the court did not choose that route, he wanted custody and was opposed to having Clark returned to Mother, as he did not want the risk of Clark being removed for a third time. *Id.* at p. 186.

{¶ 41} E.J. had not seen Charles or Connie for at least five months before the hearing, and his wishes were unknown at the time of the hearing. Previously, E.J. told MCCS that he feared the children being returned to Mother and felt they were doing much better in their current situation. *Id.* at p. 197. This factor leaned toward leaving the children where they were.

### (b) The children's wishes

{¶ 42} There was no in-chambers interview of the children. However, the children's attorney filed a notice with the court on March 13, 2020, indicating that while he had missed the last custody hearing due to an emergency illness that landed him in the hospital, his clients wished to remain in their current placement. Notice (March 13, 2020), p. 1. The GAL did say in his last report that the two younger children had said that they wished to live with their mother. GAL Report (March 6, 2020), p. 4. However, the GAL also stated that:

> The children have reported to various sources, including this GAL, that their mother pressures them to say that they want to come back to live with her. She has been seen asking questions and taking notes of their answers with regard to this. This has reportedly been happening at the end of every visit recently. The undersigned is very concerned that the children are being put in the middle of a situation that they did not create and should not be made to feel responsible for.

*Id.* at p. 5-6. This factor weighed against returning the children to Mother.

(c) The children's interaction with parents, siblings, and others affecting

the children's best interest

**{¶ 43}** There is no question that the children love Mother and that she loves them. Tr. at p. 26 and 160. Mother also had consistently visited with the children. *Id.* at p. 25, 178, and 181. However, the children told both Beth, the caseworker, and Tina that while they loved Mother and did not want to hurt her feelings, they were happy and wanted to stay where they felt safe. *Id.* at p. 27 and 117-118. Mother had also talked negatively to the children about the other adults in their lives, leaving the children in the middle. *Id.* at p. 40.

**{¶ 44}** The children were very close with their former foster family in Virginia (the Burkas), who had fostered the two eldest children for six months when Mother was pregnant with Clark and for a year in 2012-2013 after Clark was born. *Id.* at p. 153, 158, and 259. After the children were returned to Mother and came to Ohio, the Burkas kept in contact. They visited, loaned money to Mother in 2018 so that she could have her electricity turned back on, and kept the children for a month that summer to help Mother stabilize her situation (to no avail, as the children were removed in September 2018, based on deplorable conditions in the home). *Id.* at p. 155-158. During the court proceedings, the Burkas, Y.I., Tina, David, and the children all visited together when Tina and David took the children to Virginia during spring break. *Id.* at 31 and 159. Mr. Burka described the relationship between all these people as "a village that is helping raise these children." *Id.* at p. 159.

**{¶ 45}** Clark's father, Y.I., who lived in Virginia, visited Clark as often as he could, had phone contact around three times a week with Clark, and had always been involved

with all three children, not just with his own child. *Id.* at p. 31, 70, 186, and 187. Unfortunately, despite MCCS's repeated efforts, the state of Virginia had refused to conduct a home study for Y.I. *Id.* at p. 26, 71, and 185.

{¶ 46} Until the day of the final hearing in March 2020, Mother had "consistently and repeatedly" said that once the children were returned to her, she would sever the children's relationships with the Burkas, with Tina and David, with the children's adult sister, C.B., and with Mother's sister, despite being made aware that the children cared for these people and were afraid of that happening. Tr. at p. 34 and 180. Mother also told C.B. that she would not be allowed to see or speak with the children if they were returned. *Id.* at p. 93.

{¶ 47} Finally, E.J. had sporadic contact with the children before they were removed and had not seen them for several months before the final custody hearing. *Id.* at p. 182, 198 and 238.

{¶ 48} Depriving the children of supportive people who care about them and have aided them in the past did not serve the children's best interest. Therefore, this factor did not support giving Mother legal custody.


(d) The children's adjustment to the their home, school, and community

{¶ 49} Without question, the children were living in very bad circumstances before they were removed. Moreover, as indicated, Connie has special needs due to her autism. Connie's teacher, Kelly, testified at the hearing. Kelly, a teacher with 40 years of experience, is an intervention specialist who writes individualized education programs (IEPs) and sits in on IEP meetings. Tr. at p. 78-79. Kelly was familiar with both Clark

and Connie, and Connie was in Kelly's class for the fourth and fifth grades, during the 2017-2018 and 2018-2019 school years. *Id.* In other words, Kelly had close contact with Connie both before and after she was removed from Mother's home.

{¶ 50} Before the children were removed, Connie was often very late for school and wore clothes that were ill-fitting and not clean. Connie also had hygiene issues. *Id.* at p 79. Connie came to school with food and dirt on her face and had a very hard time making friends. In addition to having autism, Connie had attention deficit hyperactivity disorder, for which she was not medicated. As a result, Connie could not pay attention or have conversations with other children. *Id.* at p. 80. Because of Connie's appearance, other children ostracized her and did not interact with her. They even asked not to sit beside Connie because she did not smell good at times. *Id.*

{¶ 51} Due to this situation, Kelly kept a hairbrush, a toothbrush, toothpaste and wipes at her desk, so that Connie could clean up before coming into class. Kelly also kept a detangler product in her desk because Connie's hair was tangled. The ill-fitting clothes and cleanliness were brought up during IEP meetings, but Mother blamed it on Connie. *Id.* at p. 79-81. Mother said that Connie would not get up, did not take care of herself, and was going to have to deal with the consequences. *Id.* at p. 81. Clark also came to school messy at times, but his hair was shorter. *Id.* at p. 82.

{¶ 52} After the children were removed, there was a "night and day difference. * * * The children came in clean. They came in well rested. They didn't act like they were going to fall asleep." *Id.*

{¶ 53} Before the children were removed, Connie had more days that she was tardy than she was on time. Afterward, she had only excused tardiness or absence, like

for doctor's appointments.   Tr. at p. 85.   Connie made great progress after removal; she was getting her work done, was getting her medication regularly, had clothes that fit, was clean, and no longer had black circles under her eyes.   *Id.* at p. 83 and 88.   Kelly described the children (Connie and Clark) after removal as being happy and like regular kids.   *Id.* at p. 84.

{¶ 54} For the first few months after removal, the eldest child, Charles, lived with his adult sister, C.B., and her husband.   *Id.* at p. 96.   During that time, Charles was happy and seemed relieved.   *Id.*   Custody was then switched to Tina and David, due to frustration and disagreements between Mother and C.B.   *Id.* at p. 78, 86, 91, and 97. C.B. was calling the caseworker two or three times a week regarding various texting or verbal conflicts with Mother about Charles.   *Id.* at p. 78.

{¶ 55} At the hearing, C.B. described her relationship with Mother as having been rocky her entire life.   *Id.* at p. 90.   C.B. indicated that when she lived with Mother, there were similar issues with bugs, roaches, and cleanliness, which happened over and over again.   *Id.* at p. 91 and 96.

{¶ 56} Before being removed, Charles also had attendance issues and was academically behind.   *Id.* at p. 16 and 17-18.    Afterward, his attendance improved and he made good progress in making up academic ground.   *Id.* at p. 17-18.

{¶ 57} For the 2019-2020 school year, the children transferred to the local schools where Tina and David lived.   The children adjusted well, were happy at their new schools, and were doing well and making friends.   Tr. at p. 16 and 67.   Charles and Connie had been steadily improving at school, making up the deficits they had before being removed.   *Id.* at p. 14, 15, 17-18, and 169.    Both Charles and Connie were also

in counseling, which was provided through their school. *Id.* at p. 169-170. In addition, they were involved in extracurricular activities. *Id.* at p. 16. Clark had been in counseling, but it was discontinued because the counselors did not feel he needed it. He was also doing very well in school academically. *Id.* at p. 171.

{¶ 58} Moreover, while Mother did attend some extracurricular activities, she caused conflict (up to the few months before the second custody hearing) by being hostile toward the children's custodians. Mother had engaged in disruptive enough behavior that the police trespassed her from the Beavercreek YMCA. *Id.* at p. 40-41, 101-106, and 112. While the custodial parents originally attempted to include Mother in various events, including coming into their home outside Mother's scheduled visitation time, Mother's behavior and animosity became such that Tina discontinued this. *Id.* at 101-103.

{¶ 59} Finally, the GAL reported in his latest report that "the needs of the children are being met in their current placements, and they seem happy and well-adjusted. They have blossomed in their current placement." GAL Report (March 6, 2020), at p. 7.

{¶ 60} Without question, this factor weighed against Mother. The children were safer and happier and did much better at school after they were removed.

(e) The mental and physical health of all persons involved

{¶ 61} Facts pertaining to this issue have been discussed above. Two of the children (Charles and Connie) had special needs that were being addressed after their removal, and they were both in counseling (which they were not involved in before removal). Mother had been diagnosed with a major depressive disorder and was taking

medication.  Tr. at p. 204, 214, and 253.  By Mother's account, the medication was helping.  *Id.* at p. 253.

**{¶ 62}** No testimony was presented about the mental or physical health of E.J., Y.I., Tina, or David.   This factor was essentially neutral.


(f)   The parent more likely to honor and facilitate court-approved

parenting time rights or visitation and companionship rights.

**{¶ 63}** MCCS's caseworker indicated that Tina and David had been extremely flexible and open in working with all the adults in the children's lives and had facilitated relationships between the children and their support networks.  Tr. at p. 188.  This is also evident in the testimony related above.   In contrast, Mother had indicated an intent not to cooperate, both in her behavior and statements, despite a last-minute attempt to indicate otherwise.   Mother's change of position with respect to severing the children's relationships, made at the last hearing, contradicted what she had said during the entirety of the case and during the caseworker's last home visit, three weeks before the last hearing.  *Id.* at p. 34, 180 and 275-276.   Mother's statements, therefore, were unconvincing.   Accordingly, this factor weighed against giving Mother legal custody of the children.


(g)   Whether either parent has failed to make all child support payments,

including all arrearages, that are required of that parent pursuant to a child

support order under which that parent is an obligor

**{¶ 64}** At the time of the last custody hearing, Mother was current in her child

support payments. Due to her complaint that the support burden required her to work too much, the court reduced her support obligation. *Id.* at p. 245-246, and Order (June 22, 2021), at p. 22. Y.I. had also paid his child support, and E.J. had not paid any child support. This factor was neutral with respect to Mother and Y.I., and was in Mother's favor vis-à-vis E.J.

### (h) Convictions or Adjudications for Abuse or Neglect

{¶ 65} In this case, Mother had been adjudicated of having abused and neglected the children due to her home's condition. Magistrate's Decision and Judge's Order (Jan. 22, 2019), at p. 2, citing R.C. 2151.04(C), R.C. 2151.03(B), and R.C. 2151.03(A)(2). This factor, therefore, weighed against granting legal custody to Mother.

{¶ 66} No evidence was presented concerning R.C. 3109.04(F)(1)(i) and (j), and we need not consider them. From the preceding discussion, it is clear that nearly all the factors weighed against giving Mother legal custody and in favor of granting legal custody to Tina and David.

### (2) R.C. 2151.414(D)(1) Factors

{¶ 67} R.C. 2151.414(D)(1) states that various factors should be considered in deciding a child's best interest, and the juvenile court discussed these points as well. We will briefly consider these matters.

### (a) Interaction of those who may significantly affect the child

{¶ 68} We have already discussed this factor in connection with R.C.

3109.04(F)(1)(a) and need not consider it further.

(b) The wishes of the child, as expressed directly by the child or through

the child's guardian ad litem, with due regard for the maturity of the child

{¶ 69} We have already discussed this point, and this factor weighed against granting Mother legal custody.

(c) The custodial history of the child, including whether the child has been

in the temporary custody of one or more public children services agencies

or private child placing agencies for twelve or more months of a

consecutive twenty-two-month period, or the child has been in the

temporary custody of one or more public children services agencies or

private child placing agencies for twelve or more months of a consecutive

twenty-two-month period and, as described in division (D)(1) of section

2151.413 of the Revised Code, the child was previously in the temporary

custody of an equivalent agency in another state

{¶ 70} As noted, Charles and Connie had previously been removed from Mother's care for a total of 18 months in Virginia, and Clark had been removed from Mother's care for about 12 months. This factor weighed against Mother. Notably, MCCS was particularly concerned about Mother's ability to maintain progress and the impact of yet another removal on the children. Tr. at p. 33, 176, 181, and 188.

(d) The child's need for a legally secure permanent placement and whether that

type of placement can be achieved without a grant of permanent custody to the

agency

{¶ 71} Although permanent custody is not being considered here, the juvenile court considered Mother's case plan in detail and found that Mother had completed some case plan objectives such as the requirement to obtain mental health and psychological/parenting assessments. However most of the rest of Mother's case plan objectives were "ongoing," and one objective (attending medical and educational appointments) was incomplete. Order (June 22, 2021), at p. 10-13. Consequently, contrary to Mother's claim, she did not complete all her case plan requirements. The testimony supported the court's conclusion. Tr. at p. 22, 24, 26, 176-177, 179, and181.

{¶ 72} Having reviewed the entire record, we agree that while Mother had made progress on her case plan, there was reason for concern over whether her progress could be sustained. In particular, some progress (such as refraining from conflict) was quite recent, and other progress (like agreeing not to sever relationships that benefit the children) was, frankly, not credible. Furthermore, Mother had a long history of having her children removed and of having parenting and cleanliness issues. In contrast, the period of progress had been brief.

(e) Whether any of the factors in divisions (E)(7) to (11) of this section

apply in relation to the parents and child

{¶ 73} These factors involve matters like convictions for certain crimes involving a sibling or a child living in a parent's household, refusal of medical treatment or food to the child, placing the child in substantial harm due to alcohol or drug abuse, abandonment of

the child, and prior termination of parental rights to a sibling of the child. The juvenile court did not find that any of these factors applied to Mother, but it did conclude that E.J. had abandoned Charles and Connie by failing to visit with them for the preceding 90 days and by failing to contact MCCS. This finding was well-supported in the record.

{¶ 74} Finally, the juvenile court concluded that MCCS had made reasonable efforts to prevent the children's removal, to eliminate the continued removal, or to make it possible for the children to safely return. Order (July 22, 2021), at p. 15-16. Again, we agree with the court.

{¶ 75} Based on the preceding discussion, we reject Mother's arguments and find no error by the juvenile court. Accordingly, Mother's sole assignment of error is overruled.

{¶ 76} The judgment of the juvenile court is affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and DONOVAN, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Heather N. Ketter
Robert Alan Brenner
Hon. Anthony Capizzi